**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

STARR INDEMNITY & LIABILITY
COMPANY,

               Plaintiff,

v.

MARINE ENVIRONMENTAL REMEDIATION
GROUP, LLC,

               Defendant.

17 Civ. 9881 (LGS) (HP)

 

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**
**AND TO DISMISS FOR FAILURE TO STATE A CLAIM**

NICOLETTI HORNIG & SWEENEY
Wall Street Plaza
88 Pine Street, Seventh Floor
New York, New York 10005
(212) 220-3830

*Attorneys for Plaintiff*

Of Counsel

    Guerric S.D.L. Russell
    Terry L. Stoltz
    Kevin J.B. O'Malley

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................... iii

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL BACKGROUND ...................................................................................................... 2

    I.     The Policy ............................................................................................................ 2

    II.    The Dismantling of the LONE STAR ................................................................ 4

    III.   The Sinking of the LONE STAR ...................................................................... 10

ARGUMENT ............................................................................................................................ 13

POINT I

    STARR IS ENTITLED TO SUMMARY JUDGMENT
    ON ITS FIRST CAUSE OF ACTION ............................................................................ 13

    A.    The Barge Is Presumed To Be Unseaworthy ...................................................... 15

        1.    The barge sank at its dock ...................................................................... 16

        2.    The cause of the sinking is unexplained. ................................................ 17

    B.    MER Did Not Exercise Due Diligence ................................................................ 17

    C.    The Court May Presume That Unseaworthiness
          Was The Proximate Cause Of The Sinking ........................................................ 19

POINT II

    STARR IS ENTITLED TO SUMMARY JUDGMENT
    ON ITS SECOND CAUSE OF ACTION ....................................................................... 19

POINT III

    STARR IS ENTITLED TO SUMMARY JUDGMENT
    ON ITS SIXTH CAUSE OF ACTION ........................................................................... 21

POINT IV

    STARR IS ENTITLED TO SUMMARY JUDGMENT
    ON COUNT II OF MER'S COUNTERCLAIMS ........................................................... 21

POINT V

COUNTS V AND VI OF MER'S COUNTERCLAIMS SHOULD
BE DISMISSED FOR FAILURE TO STATE A PLAUSIBLE CLAIM......................... 22

A.      Count V Of MER's Counterclaims ........................................................ 23

B.      Count VI Of MER's Counterclaims ....................................................... 23

CONCLUSION..................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**

*Am. Nat. Fire Ins. Co. v. Kenealy*,
72 F.3d 264 (2d Cir. 1995)...............................................................................22, 24

*Arch Ins. Co. v. Harleysville Worcester Ins. Co.*,
56 F. Supp. 3d 576 (S.D.N.Y. 2014)..........................................................................21

*Austin v. Servac Shipping Line*,
794 F.2d 941 (5th Cir. 1986) ....................................................................................16

*Bi-Econ. Mkt., Inc. v. Harleysville Ins. Co. of New York*,
886 N.E.2d 127 (N.Y. 2008).......................................................................................24

*Braker v. F.W. Jarvis Co.*,
166 F. 987 (S.D.N.Y. 1908)........................................................................................16

*The BUFFALO*,
56 F.2d 738 (2d Cir. 1932).........................................................................................16

*Certain Underwriters at Lloyd's, London Subscribing to Policy 200-451-8464 v. Johnston*,
124 F. Supp. 2d 763 (D.P.R. 1999)...........................................................................14

*Commercial Union Ins. Co. v. Flagship Marine Servs., Inc.*,
190 F.3d 26 (2d Cir. 1999).......................................................................13-14, 15, 19

*Eccobay Sportswear, Inc. v. Providence Washington Ins. Co.*,
585 F. Supp. 1343 (S.D.N.Y.1984)............................................................................25

*Fed. Ins. Co. v. PGG Realty, LLC*,
538 F. Supp. 2d 680 (S.D.N.Y. 2008) .........................................................14, 15, 16

*Federazione Italiana Dei Consorzi Agrari v. Mandask Compania De Vapores, S.A.*,
388 F.2d 434 (2d Cir. 1968).......................................................................................19

*Fireman's Fund Ins. Co. v. Great Am. Ins. Co.*,
10 F. Supp. 3d 460 (S.D.N.Y. 2014)..........................................................................20

*Forbes v. Merchants' Exp. & Transp. Co.*,
111 F. 796 (E.D.N.Y. 1901)........................................................................................16

*GEICO Marine Ins. Co. v. Shackleford*,
316 F. Supp. 3d 1365 (M.D. Fla. 2018).................................................................14-15

*Harris v. Provident Life & Acc. Ins. Co.*,
310 F.3d 73 (2d Cir. 2002)..........................................................................................23

*ICD Holdings S.A. v. Frankel*,
976 F. Supp. 234 (S.D.N.Y. 1997)..........................................................23

*Ingersoll Mill. Mach. Co. v. M/V BODENA*,
829 F.2d 293 (2d Cir. 1987).................................................................24

*Ins. Co. of N. Am. v. Lanasa Shrimp Co.*,
726 F.2d 688 (11th Cir. 1984) .............................................................17

*The JAMAICA*,
51 F.2d 858 (W.D.N.Y. 1931) ...............................................................16

*Jarvis Towing & Transp. Corp. v. Aetna Ins. Co.*,
82 N.E.2d 577 (N.Y. 1948)....................................................................15

*The JAY ST. TERMINAL NO. 3*,
281 F. 279 (2d Cir. 1922) .....................................................................16

*The KATHRYN B. GUINAN*,
176 F. 301 (2d Cir. 1910) .....................................................................16

*King v. Allstate Ins. Co.*,
906 F.2d 1537 (11th Cir. 1990) ............................................................14

*Kinra v. Chicago Bridge & Iron Co.*,
No. 17 Civ. 4251 (LGS), 2018 WL 2371030 (S.D.N.Y. May 24, 2018).............22, 23

*Knight v. U.S. Fire Ins. Co.*,
804 F.2d 9 (2d Cir. 1986) .....................................................................20

*Lang v. Hanover Ins. Co.*,
820 N.E.2d 855 (N.Y. 2004)..................................................................22

*In re Marine Sulphur Queen*,
460 F.2d 89 (2d Cir. 1972)....................................................................19

*McAllister Lighterage Line, Inc. v. Ins. Co. of N. Am.*,
244 F.2d 867 (2d Cir. 1957)..................................................................15

*New York Univ. v. Continental Ins. Co.*,
662 N.E.2d 763 (N.Y. 1995)..................................................................24

*NY Marine & General Ins. Co. v. Tradeline (L.L.C.)*,
266 F.3d 112 (2d Cir. 2001)..................................................................20

*Puritan Ins. Co. v. Eagle S.S. Co.*,
779 F.2d 866 (2d Cir. 1985)..............................................................19-20

iv

*RLI Ins. Co. v. JDJ Marine, Inc.*,
 No. 07 Civ. 9546, 2012 WL 3765026 (S.D.N.Y. Aug. 29, 2012) .............................. 20

*Rocanova v. Equitable Life Assur. Socy. of U.S.*,
 634 N.E.2d 940 (N.Y. 1994).................................................................... 24

*Rosano v. Freedom Boat Corp.*,
 No. 13 Civ. 842, 2015 WL 4162754 (E.D.N.Y. July 8, 2015) ............................ 23, 24

*Royal Indem. Co. v. Deep Sea Int'l*,
 619 F. Supp. 2d 14 (S.D.N.Y. 2007)............................................................ 14

*Sask. Gov't Ins. Office v. Spot Pack, Inc.*,
 242 F.2d 385 (5th Cir. 1957) ................................................................... 14

*In re Sept. 11th Liab. Ins. Coverage Cases*,
 458 F. Supp. 2d 104 (S.D.N.Y. 2006)........................................................... 3

*Smith v. Lightning Bolt Prods.*,
 861 F.2d 363 (2d Cir. 1988).................................................................... 24

*Spandex House, Inc. v. Travelers Prop Cas. Co. of Am., Inc.*,
 No. 14 Civ. 4251, 2015 WL 509678 (S.D.N.Y. Feb. 6, 2015) ................................ 23

*Starr Indem. & Liab. Co. v. Marine Envtl. Remediation Grp., LLC*,
 No. 17 Civ. 9881, 2018 WL 3611970 (S.D.N.Y. July 27, 2018) ............................... 1

*State Nat. Ins. Co. v. Anzhela Explorer, L.L.C.*,
 812 F. Supp. 2d 1326 (S.D. Fla. 2011) ........................................................ 14

*U.S. v. Banda Boats, Inc.*,
 990 F.2d 626 (5th Cir. 1993) .................................................................. 18

*Walker v. Sheldon*,
 179 N.E.2d 497 (N.Y. 1961).................................................................. 24, 25

## Rules

Fed. R. Civ. P. 12................................................................................. 2

Fed. R. Civ. P. 56................................................................................. 2

## Other Authorities

Thomas J. Schoenbaum,
 2 *Admiralty and Maritime Law* (6th ed. 2018) ............................................. 14, 16, 17

## PRELIMINARY STATEMENT

The Barge LONE STAR, owned by Defendant Marine Environmental Remediation Group, LLC ("MER"), sank at its dock sometime between April 29 and 30, 2017. The only cause for the sinking put forward by MER is that unknown vandals or saboteurs snuck onto the barge and opened valves, causing the barge to quickly flood and sink. MER acknowledges, however, that this theory is no more than a guess. The evidence does not support such speculation.

Plaintiff Starr Indemnity & Liability Company insured MER under the terms and conditions of a vessel pollution liability insurance policy. Oil was found to have been discharged into the water near the LONE STAR following its sinking. Starr, subject to a reservation of rights, paid or incurred $2,485,358.97 in costs and expenses on behalf of MER in connection with the response to the sinking of the LONE STAR. Starr seeks full reimbursement from MER because there is no coverage under the policy for the response to the sinking.

The policy contained an express warranty under which MER "warranted" that it "shall at all times use due diligence to maintain [the LONE STAR] in a seaworthy condition." The facts show that MER breached this warranty. The barge is presumed to have been unseaworthy because it sank at its dock and because the cause of the sinking is unexplained. MER cannot rebut this presumption. In any event, MER failed to use due diligence to maintain the LONE STAR in a seaworthy condition because, among other things, the barge's watertight integrity and stability had been compromised. A breach of an express warranty in a marine insurance policy precludes coverage regardless of its causal connection to the loss.[1] So, even if there were a vandal or a saboteur, MER's breach of the express warranty precludes coverage nonetheless.

The parties to a marine insurance contract are held to the highest degree of good faith.

---

[1] The Court has held that the Starr policy is a marine insurance contract. *Starr Indem. & Liab. Co. v. Marine Envtl. Remediation Grp., LLC*, No. 17 Civ. 9881, 2018 WL 3611970 (S.D.N.Y. July 27, 2018).

MER breached its duty of utmost good faith when, in its application for insurance, it misrepresented that its "process of ship demolition" would "maintain[ ] the ship's watertight integrity, trim and stability" and would keep the barge "afloat and capable of being towed." None of this proved to be true with regard to MER's demolition of the LONE STAR.

Starr moves pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment on its claims that MER breached the express warranty, breached its duty of utmost good faith and owes Starr full reimbursement. Starr also moves for summary judgment on MER's counterclaim for breach of contract, which should be granted because the breaches alleged by MER are not sustainable. Finally, Starr moves pursuant to Rule 12(c) of the Federal Rules of Civil Procedure to dismiss two of the causes of action alleged in MER's Counterclaims. They fail to state a plausible claim to relief because the governing law does not recognize a separate cause of action for either breach of the duty of good faith and fair dealing or bad faith insurance practice.

## **FACTUAL BACKGROUND**[2]

### I.     **The Policy**

In May 2015, Safe Harbor Pollution Insurance was asked to provide MER with pollution liability coverage.[3] Declaration of Russell Brown executed on May 11, 2018 ("Brown Dec.") ¶ 4. Safe Harbor ultimately issued Policy No. V-90054-15 to MER with a policy period running from June 30, 2015 to June 30, 2016. *Id.* The LONE STAR was subsequently added to the Schedule of Vessels for this policy pursuant to MER's request. *Id.* ¶ 5; Complaint (ECF Doc. 1) ¶ 6; Answer (ECF Doc. 17) ¶ 6. MER did not advise that the LONE STAR was to be scrapped. Brown Dec. ¶

---

[2] The factual background provided herein includes both the facts material to Starr's motion for partial summary judgment and general background facts. The material facts are those stated in Plaintiff's Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1(a).

[3] Safe Harbor is a syndicate of insurance companies, including Starr, that provides marine pollution insurance. Brown Dec. ¶ 2; Declaration of Lincoln Purdy executed on May 10, 2018 (ECF Doc. 34-4; "Purdy Dec.") ¶ 5.

5. MER allowed Policy No. V-90054-15 to lapse upon its expiration on June 30, 2016. *Id.* ¶ 8.

Arthur J. Gallagher & Co. ("Gallagher") contacted Safe Harbor on July 29, 2016 and advised that Gallagher had been appointed as MER's insurance broker.[4] *Id.* ¶ 9. Gallagher also advised that MER wanted to renew the Safe Harbor policy for the June 30, 2016 to June 30, 2017 policy period. *Id.* Safe Harbor issued MER a backdated pollution liability insurance policy, Policy No. V-90054-16, on or about August 11, 2016 for the policy period running from June 30, 2016 to June 30, 2017. *Id.* ¶ 10. The Schedule of Vessels for this policy included the LONE STAR. *Id.* ¶ 10. Policy No. V-90054-16 was subsequently rejected by Gallagher because Safe Harbor was not admitted to issue policies in the Commonwealth of Puerto Rico, where MER's operations are based. *Id.* ¶ 12; Purdy Dec. ¶ 6. As a result, Safe Harbor asked Starr on August 30, 2016 if Starr would issue a similar pollution liability insurance policy to MER because Starr is admitted to issue policies in Puerto Rico. Brown Dec. ¶ 13; Purdy Dec. ¶ 7.

As part of MER's application for insurance, Starr received a document originally provided to Safe Harbor by Gallagher captioned "Marine Environmental Remediation Group LLC Marine Specifications Submission" (the "Insurance Submission"). Purdy Dec. ¶ 8; Ex. A to Purdy Dec; Ex. 1 to Declaration of Kevin J.B. O'Malley executed on April 3, 2019.[5] The Insurance Submission listed the LONE STAR as one of the vessels owned by MER and stated that the vessel was "slated for demolition." Ex. A to Purdy Dec. at 3. MER's "process of ship demolition" was described in the Insurance Submission as "reverse-engineering the ship, through the removal of larger intact sections … while maintaining the ship's watertight integrity, trim and stability." *Id.* at 1. The document also stated that the vessels to be scrapped would be "reduced to the lower hull area" but

---

[4] The presumption is that an insurance broker acts as the insured's agent in procuring the insurance policy. *See*, *e.g.*, *In re Sept. 11th Liab. Ins. Coverage Cases*, 458 F. Supp. 2d 104, 117 (S.D.N.Y. 2006).

[5] Unless noted otherwise, all "Ex. __" references are to the exhibits attached to the O'Malley Declaration.

"still afloat and capable of being towed." *Id.* None of this proved to be true with regard to MER's demolition of the LONE STAR.

In response to the application for insurance, Starr issued Vessel Owner/Operator Pollution Coverage Policy No. MASILNY00047816 (the "Policy") with a policy period from June 30, 2016 to June 30, 2017.[6] Purdy Dec. ¶ 9; Ex. B to Purdy Dec. The Vessel Schedule for the Policy included the LONE STAR. Ex. B to Purdy Dec. The Policy provided, among other things, pollution liability coverage to MER for amounts MER would be legally obligated to pay by reason of discharges from any of the scheduled vessels of oil or pollutants into the navigable waters of the United States of America. *Id.* The terms and conditions of the Policy state, in relevant part:

**CHAPTER 1**
**GENERAL TERMS, CONDITIONS, AND LIMITATIONS**

\* \* \*

(b)     The Insured's breach of any warranty, express or implied, contained in this Policy shall immediately void this Policy as of the time of the breach and no claim shall be paid under this Policy for losses arising after the breach. The Company may, at its sole discretion, continue coverage provided that (i) it has received written notice of the breach from the Insured, and (ii) the Insured has paid any additional premium as the Company may require and the Company has confirmed in writing that coverage is continued.

(c)     It is warranted by the Insured that, after the inception of the Policy, the Insured shall at all times use due diligence to maintain each of the Vessels named in the Vessel Schedule in a seaworthy condition.

*Id.* at 12 of 29.

## II.     The Dismantling of the LONE STAR

Sometime after the inception of the Policy, MER began to dismantle the LONE STAR at its Roosevelt Roads facility in Puerto Rico while the barge was in the water and tied up to Pier 3. Complaint ¶ 10; Answer ¶ 10; Ex. 2 ("Fitzgerald Tr.") at 27-29. MER's designated corporate

---

[6] The policy period was ultimately extended to September 17, 2017. Ex. B to Purdy Dec. at 29 of 29.

witness, Lawrence Kahn, explained that MER's plan was to "canoe" the barge and to then remove it from the water to cut it into pieces. Ex. 3 ("MER Tr.") at 176. The Director of Operations for MER, Philip Fitzgerald, explained that "[c]anoeing the vessel means[ ] pulling steel from the vessel [so] that [it] would be light enough to where I can get the vessel up on land." Fitzgerald Tr. at 29, 32 & 52.

As built, the LONE STAR had an overall length of 313 feet and a depth (*i.e.*, vertical height) of nineteen feet from the top of the hull to the keel. Attachment 4 to Ex. 4. The dismantling of the barge changed these dimensions noticeably.

By October 2016, some of the deck plating had been removed and the main deck was open in places. Fitzgerald Tr. at 29 & 51. Between late November 2016 and late January 2017, MER started to canoe the barge. *Id.* at 52. A photograph taken in November 2016 shows the LONE STAR as it appeared in the process of being canoed. Fitzgerald Tr. at 57.



Ex. 5  The bow is at the top of the picture and the stern at the bottom.  Fitzgerald Tr. at 59.  The appearance of the Barge changed after this picture was taken because "another 30 feet" of steel in the "center portion" of the barge and "the forward portion of the bow" were ultimately removed as part of the dismantling process.  *Id.* at 57-60.  The removal of the forward portion of the bow, the "rake," shortened the vessel from 313 feet to about 296 feet.  *Id.* at 59-60, 80-81 & 129.

The dismantling and canoeing of the LONE STAR stopped in late January 2017 because MER decided "to do a reset on the company."  *Id.* at 52 & 63.  The canoeing of the barge was not yet complete when work stopped.  *Id.* at 52 & 56.  MER laid off all but four of its employees.[7]  Fitzgerald Tr. at 34, 41 & 60.  The four remaining employees were Mr. Fitzgerald, Bobby Graham, Richard Parmenter and Hector Lopez.[8]  *Id.* at 34.

The only work involving the LONE STAR after late January 2017 was to pump out accumulated rain water from the barge.  *Id.* at 63; Ex. 6 ("Parmenter Tr.") at 45-46; Ex. 7 ("Lopez Tr.") at 68.  Rain water would accumulate in certain areas all over the barge because the barge was open and exposed to the weather.  Fitzgerald Tr. at 79-80; Parmenter Tr. at 45-46.  It would accumulate from frame 4 through frame 12 at the bow and other areas of the barge, as indicated by green arrows drawn by Mr. Fitzgerald on Ex. 5.  Fitzgerald Tr. at 71-72, 79 & 81.

The practice as to when pumping would be done was set by Mr. Fitzgerald.  *Id.* at 70.  He stated that pumping would not be done after every rain storm but only after a "[r]ain storm with sufficient enough rain to be pumped out."  *Id.* at 70 & 73.  Mr. Parmenter agreed that this was the practice.  Parmenter Tr. at 46.  Mr. Fitzgerald explained that "the vessel would have to accumulate at a minimum of eight inches of water … in order for a pump to remove it …," whereas

---

[7] A fifth employee also remained, but he was an accountant who was not involved in vessel operations.  Fitzgerald Tr. at 34 & 41.

[8] Mr. Graham is deceased and was not deposed.

Mr. Parmenter thought four or five inches of water were needed. Fitzgerald Tr. at 70-71; Parmenter Tr. at 48-50. Both Mr. Fitzgerald and Mr. Parmenter stated that the height of accumulated water was measured against the top of the ribs running lengthwise from the bow to the stern at the bottom the barge, which Mr. Fitzgerald believed were eight inches high. Fitzgerald Tr. at 71-73; Parmenter Tr. at 48-50.

Mr. Fitzgerald acknowledged that "[y]ou could only see the water accumulation in certain parts of the vessel." Fitzgerald Tr. at 71-72 & 79-80. He claimed that MER's employees would board the LONE STAR each time they inspected for water accumulation. Fitzgerald Tr. at 72. The other MER employees, however, said this was not so. Mr. Parmenter testified that he would not go onto the barge to look for water. Parmenter Tr. at 47. Mr. Lopez testified that Mr. Graham would also not go onto the LONE STAR. Lopez Tr. at 52:2-9. Critically, as detailed below, none of MER's employees boarded the LONE STAR to look for water the last time they saw the barge before it sank. Fitzgerald Tr. at 110; Parmenter Tr. at 81; Lopez Tr. at 52:10-20.

Research conducted by Starr's expert meteorologist shows that there were between 8.84 and 10.098 inches of precipitation from January 1, 2017 through April 30, 2017 in the area where the LONE STAR was docked. *See* Ex. 8 at 3 (Chart 2) & 8 (Chart 4). The majority of the precipitation occurred in March and April, with between 1.75 and 3.173 inches in March and 4.7 and 5.15 inches in April. *See id.* Except for a couple of days in April, daily precipitation amounts during this period were less than one inch. *See id.* In other words, according to the practice set by Mr. Fitzgerald, MER's employees would not have pumped the barge out every time it rained in March and April, instead leaving the rain water to accumulate over time.

Mr. Fitzgerald, who did not participate in the pumping process, could not remember when the last time the barge was pumped out prior to the sinking. Fitzgerald Tr. at 109; Parmenter Tr.

at 59.  He did not recall any pumping activities during the two weeks before it sank.  Fitzgerald

Tr. at 108-09.  Similarly, Mr. Parmenter testified that the last time he personally pumped water out

of the barge was some "four to five weeks" before it sank.  Parmenter Tr. at 81-82.  He could not

recall the last time anyone else had pumped the barge out before the sinking.  *Id.* at 82.  Notably,

there were between 5.26 and 5.4 inches of precipitation in the four to five weeks before the sinking.

*See* Ex. 8 at 3 (Chart 2) & 8 (Chart 4).  Mr. Lopez could only recall being personally involved with

pumping the barge on a single occasion in all of 2017.  Lopez Tr. at 69.

A photograph depicts the bow of the LONE STAR as it appeared in April 2017, after the

rake had been removed.  Fitzgerald Tr. at 81, 84 & 125-26.



Ex. 9.  The section of the barge shown in the photograph was the point where there was the least

amount of hull from the surface of the water up to the top of the barge.  Fitzgerald Tr. at 126.

Frame 4 was the forward most bulkhead of the barge remaining after the rake was removed, and it

became the bow (or front) of the barge.  *Id.* at 81.  Frank Magaraci, a salvage master who attended

the raising of the sunken LONE STAR on behalf of Starr, inspected the bow section of the barge

after it was taken out of the water.  Declaration of Frank Magaraci executed on April 3, 2019

("Magaraci Dec.") ¶¶ 2-6.  He found the distance between the waterline and the top of frame 4

across the front of the barge was approximately 2½ to 3 feet. *Id.* ¶ 7. Separately, Mr. Fitzgerald estimated that there were four to five feet between the top of the barge's side and the water at the forward section. Fitzgerald Tr. at 124-25. About half of the double bottom hull structure of the barge had been removed by April 2017. *Id.* at 56-57.

The sea chest is an opening on the side shell of the barge. *Id.* at 171. It allows water to come from outside the vessel into the interior piping of the vessel. *Id.* The LONE STAR had two sea chests, one on the port side and another on the starboard side. Ex. 4 at 19. Mr. Fitzgerald refused to give a straight answer when asked whether MER had blocked the sea chest openings prior to the sinking to prevent water from entering the barge's interior piping. Fitzgerald Tr. at 170-72. He only stated that there was "no requirement" to do so. *Id.* Starr's expert marine engineer and surveyor, Alan Colletti, notes that "the normal and customary practice in the marine industry as well as being a good marine engineering practice would be to prevent any seawater ingress to the vessel being dismantled and scrapped by placing covers (steel blanks) over the hull's sea chest openings." Ex. 4 at 22.

The sea chest valves on the LONE STAR, which are different from the sea chests, had handles to open and close the valves. Fitzgerald Tr. at 169. These handles were not chain locked prior to the sinking of the barge. *Id.* Mr. Colletti opines that "MER failed to exercise due diligence by not securing in a closed position the 24" diameter port and starboard sea valves by either welding their valve stems to prevent them from being opened or by any other effective method to prohibit their opening (e.g. chain and lock the valve hand wheel)." Ex. 4 at 22.

Mr. Colletti attended the raising of four sections of the sunken LONE STAR, and he inspected those sections by physically climbing and crawling through them. *Id.* at 14. The sections inspected by Mr. Colletti "were found replete with open and disconnected piping …." *Id.* at 23.

These pipelines "were left totally open inside the hull, not blanked off or isolated by a valve." *Id.* at 14. Of particular importance, Mr. Colletti noted that overboard openings on the hull were close to or below the vessel's waterline. *Id.* These openings "would be potential and likely sources of seawater ingress in the event the vessel's draft increased, whether due to shifting of the vessel either by wave action or wind, or by gradual internal leakage, rainwater, or inflow from the sea chests." Ex. 4 at 14 (footnote omitted).

Mr. Colletti opines that "[a]ny of the open and disconnected piping, if supplied with seawater, would allow flooding of the vessel's internal areas and, if unchecked, would eventually build up in volume until the vessel's reserve buoyancy was exceeded and the vessel sank." *Id.* at 23. He notes that "accumulated rainwater would also have added to degrade buoyancy if not pumped out." *Id.* He further opines that, "[d]uring the dismantling process, MER disregarded its own procedure to maintain the watertight integrity, trim, and stability of the hull when it cut the hull down beyond the 'canoe' point at the bow or, more accurately, the forward end of the 'Barge' at Bulkhead No. 4 since the bow rake had already been removed; and as a result, there was only 2½' to 3' of vessel structure extending vertically above the waterline in this area." *Id.* at 22. Finally, Mr. Colletti opines that "it is very doubtful any reputable towing company would have accepted towing the [LONE STAR]" with "the bow cut down so close to the water in such a hazardous condition." *Id.* at 23. In sum, Mr. Colletti is of the opinion that the LONE STAR's "watertight integrity and stability had been compromised" and that the barge "was not in a towable condition" prior to its sinking. Ex. 4 at 23.

### III.    The Sinking of the LONE STAR

Messrs. Fitzgerald, Graham, Parmenter and Lopez all worked at the MER facility on Saturday, April 29, 2017. Fitzgerald Tr. at 105-06. Mr. Fitzgerald did not go onto the LONE

STAR that day, and he left for the day before about noon. *Id.* at 106 & 110. Similarly, neither Graham nor Parmenter nor Lopez went onto the barge that Saturday. Parmenter Tr. at 81; Lopez Tr. at 52:10-20. They left for the day after Mr. Fitzgerald, as late as 4:00 p.m. Parmenter Tr. at 66, 68-69 & 82; Lopez Tr. at 58-59.

On Sunday, April 30, 2017, the barge was discovered to have sunk at its dock and oil was found to have been discharged into the water. Fitzgerald Tr. at 110 & 113:22 - 115:12. The only cause for the sinking put forward by MER is that unknown vandals or saboteurs snuck onto the barge sometime after MER's employees left on April 29th and opened valves on the barge, causing the barge to quickly flood and sink. Answer ¶ 64; MER Tr. at 273-77; Fitzgerald Tr. at 166-67. However, Mr. Kahn described this theory as "educated assumptions," not "conclusions," and Mr. Fitzgerald similarly called it an "educated guess." MER Tr. at 274; Fitzgerald Tr. at 167.

MER does not know of any witness who observed any unauthorized individuals at the MER facility during off hours on April 29th or 30th. MER Tr. at 277-78. It contracted with Anointed Security Services Inc. to provide security at its facility, with guards being on duty 24-hours a day on the weekends. Ex. 10 ("Anointed Tr.") at 7, 16, 18-19 & 28; Fitzgerald Tr. at 85. Anointed's corporate procedure was for its guards to note and to report anything out of the ordinary, including if they saw someone, heard any banging or saw a flashlight on MER's pier or vessels outside of normal business hours.[9] Anointed Tr. at 35-36, 78-79 & 143-44. The designated corporate witness for Anointed testified that nothing unusual with regard to MER's vessels or facility was logged by Anointed's guards on April 29th or 30th until Mr. Fitzgerald arrived at 6:35 p.m. on April 30th. *Id.* at 114-15 & 122-23.

Shortly after discovering that the LONE STAR had sunk, MER notified Starr of the

---

[9] A flashlight would have been noticeable, as there was no lighting on MER's pier because there was no electricity. Fitzgerald Tr. at 99 & 115.

incident through Safe Harbor. Complaint ¶ 14; Answer ¶ 14; Brown Dec. ¶ 16. Due to the immediate need for a pollution mitigation response, Safe Harbor authorized MER to retain Clean Harbors to clean-up the oil discharge. Brown Dec. ¶ 16. Clean Harbors began clean-up efforts on May 2, 2017. Complaint ¶ 14; Answer ¶ 14. Shortly thereafter, with the permission of the United States Coast Guard, the response moved to a passive recovery maintenance phase. Complaint ¶ 14; Answer ¶ 14. This allowed Clean Harbors to remain on standby if additional pollution was detected during the salvage operation of the sunken barge. Complaint ¶ 14; Answer ¶ 14. It was reported that MER would undertake the wreck removal. Answer ¶ 14.

The Coast Guard issued Administrative Order Number 007-17 to MER on July 7, 2017. Complaint ¶ 15; Answer ¶ 15; Ex. B to Brown Dec. In the Administrative Order, the Coast Guard advised that there "may be an imminent and substantial threat to the environment because of an actual and continued discharge of oil from the LONE STAR." Ex. B to Brown Dec. The Coast Guard "determined that such a threat exists to the navigable waters of Ensenada Honda." *Id.* MER was ordered to, *inter alia*, continue to contain the area surrounding the barge with boom and sorbents, to immediately remove all recoverable oil upon discovery, to utilize a third party salvage expert and to develop a plan to remove the substantial threat caused by the sunken barge, to take measures to remove any current discharge and to remove the threat of any future discharge from the vessel. *Id.* Finally, MER was advised by the Coast Guard of its potential liability under the Oil Pollution Act of 1990 and the Federal Water Pollution Control Act. *Id.* The Coast Guard issued an amendment to its Administrative Order on August 14, 2017 demanding specific actions, such as conducting a dive assessment to identify the fate and location of any oils still located within the barge. Complaint ¶ 18; Answer ¶ 18; Ex. C to Brown Dec. The Puerto Rican Department of Natural and Environmental Resources issued an order to MER on July 28, 2017 to remove the

wreck of the LONE STAR.  Complaint ¶ 17; Answer ¶ 17.

Faced with environmental liabilities, MER ultimately retained Resolve Salvage & Fire (Americas), Inc. to salvage the sunken barge.  Complaint ¶ 19; Answer ¶ 19.  In order to avoid having the Coast Guard federalize the removal – and because MER did not have the financial means to undertake the removal – Starr agreed to issue a letter of undertaking to Resolve for those amounts due under its contract with MER and to retain Randive to perform the underwater survey required by the Coast Guard.  Complaint ¶ 20.  Starr agreed to do this subject to a continuing reservation of rights.  *Id.*  Starr paid or incurred $2,485,358.97 in costs and expenses on behalf of MER in connection with the response to the sinking of the LONE STAR.

## ARGUMENT

## POINT I

## STARR IS ENTITLED TO SUMMARY JUDGMENT ON ITS FIRST CAUSE OF ACTION

Starr alleges in its First Cause of Action that the Policy was void at the time the LONE STAR sank because the barge was unseaworthy and because MER did not exercise due diligence to maintain the barge in a seaworthy condition.  *See* Complaint ¶¶ 22-29.

The Policy contains an express warranty under which MER "warranted … that, after the inception of the Policy," it "shall at all times use due diligence to maintain [the LONE STAR] in a seaworthy condition."  Ex. B to Purdy Dec. at 12 of 29, ch. 1, cl. (c).  "A 'warranty' is a promise 'by which the assured undertakes that some particular thing shall or shall not be done, or that some condition shall be fulfilled, or whereby he affirms or negatives the existence of a particular state of facts.' "  *Commercial Union Ins. Co. v. Flagship Marine Servs., Inc.*, 190 F.3d 26, 31 (2d Cir.

1999) (citations omitted).[10]  The Policy provides that MER's "breach of any warranty … shall immediately void this Policy as of the time of the breach and no claim shall be paid under this Policy for losses arising after the breach."  Ex. B to Purdy Dec. at 12 of 29, ch. 1, cl. (b).

The express warranty in the Policy is similar to, but distinct from, the "modified, negative warranty" that is implied in a hull insurance policy.[11]  The negative implied warranty is an "ongoing promise," *Royal Indem. Co. v. Deep Sea Int'l*, 619 F. Supp. 2d 14, 27 (S.D.N.Y. 2007), that requires that the "[o]wner, from bad faith or neglect, will not knowingly permit the vessel to break ground in an unseaworthy condition."  *Sask. Gov't Ins. Office v. Spot Pack, Inc.*, 242 F.2d 385, 388 (5th Cir. 1957); *see also Fed. Ins. Co. v. PGG Realty, LLC*, 538 F. Supp. 2d 680, 696-97 (S.D.N.Y. 2008), *aff'd*, 340 F. App'x 5 (2d Cir. 2009).  The negative implied warranty can also arise as a matter of contract, which is the case where an insured expressly agrees to "exercise due diligence to keep the Vessel(s) seaworthy."  *State Nat. Ins. Co. v. Anzhela Explorer, L.L.C.*, 812 F. Supp. 2d 1326, 1377 (S.D. Fla. 2011).

The terms of an insurance policy may alter the traditional negative implied warranty.[12]  *See id.*; *see also King v. Allstate Ins. Co.*, 906 F.2d 1537, 1541 (11th Cir. 1990) (there is "no public policy problem whatsoever in parties to a maritime insurance contract setting the terms of the policy between them"); *GEICO Marine Ins. Co. v. Shackleford*, 316 F. Supp. 3d 1365, 1376 (M.D.

---

[10] The Policy provides that it shall be governed by "federal maritime law or, in the absence of federal maritime law, the law of the State of New York."  Ex. B to Purdy Dec. at 18 of 29, ch. 6, cl. (a).

[11] In *Certain Underwriters at Lloyd's, London Subscribing to Policy 200-451-8464 v. Johnston*, 124 F. Supp. 2d 763, 772 (D.P.R. 1999), the court noted that a similar express warranty "clearly purports to reiterate the so-called 'American Rule' which has been recognized as establishing a 'negative implied warranty.' "

[12] To establish a breach of the traditional negative implied warranty, "absent specific language in a policy that alters the traditional implied warranty," *Anzhela Explorer*, 812 F. Supp. 2d at 1377, an insurer must prove that: (1) an unseaworthy condition existed at the commencement of the voyage; (2) the insured had knowledge of the unseaworthy condition and yet allowed the vessel to sail anyway; and (3) the unseaworthy condition was the proximate cause of the claimed loss, *see* Thomas J. Schoenbaum, 2 *Admiralty and Maritime Law* § 19-16, at 508 (6th ed. 2018); *Fed. Ins.*, 538 F. Supp. 2d at 696.

Fla. 2018).  In this case, there is specific language in the Policy that alters the traditional implied warranty.  There are two key distinctions between the express warranty in the Policy and the traditional implied warranty.

First, the express warranty applies "at all times," whereas the implied warranty applies at the commencement of a voyage.  The fact that the LONE STAR was docked when it sank and had not broken ground is of no moment.  MER was obligated to maintain the barge in a seaworthy condition "at all times."

Second, a breach of an express warranty precludes coverage regardless of its causal connection to the loss, whereas a breach of the negative implied warranty will preclude coverage only where the unseaworthy condition was the proximate cause of the loss.  "[A]n express ... warranty [in a marine insurance policy] must be literally complied with, and … noncompliance forbids recovery, regardless of whether the omission had causal relation to the loss." *Jarvis Towing & Transp. Corp. v. Aetna Ins. Co.*, 82 N.E.2d 577, 578 (N.Y. 1948) (citations omitted); *see also Commercial Union*, 190 F.3d at 31-32.  So, even if there were a vandal or a saboteur as alleged by MER, its breach of the express warranty precludes coverage nonetheless.

A.       **The Barge Is Presumed To Be Unseaworthy**

Seaworthiness is "the ability of a vessel adequately to perform the particular services required of her on the voyage she undertakes." *McAllister Lighterage Line, Inc. v. Ins. Co. of N. Am.*, 244 F.2d 867, 870 (2d Cir. 1957).  The standard for seaworthiness "is not perfection but reasonableness ….  [N]ot a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suited for her intended service." *Fed. Ins.*, 538 F. Supp. 2d at 693-94 (citations and internal quotation marks omitted).  The meaning of seaworthy is "relative -- it varies with the vessel involved and the use for which the vessel is intended." *Id.*

at 693.

MER intended that the LONE STAR remain in the water until the canoeing process was completed and the barge could be taken out of the water to be cut into pieces. MER Tr. at 176; Fitzgerald Tr. at 52; Ex. A to Purdy Dec. at 1. One option to take the barge out of the water under consideration by MER was to tow it to a different location at Roosevelt Roads so that it could be pulled up onto land. Ex. A to Purdy Dec. at 1. The seaworthiness of the barge should be measured against MER's intentions. More specifically, in order to be seaworthy, the LONE STAR needed to be able to stay afloat until the canoeing was completed and then needed to be in a towable condition. Indeed, this is the description given by MER in its Insurance Submission.

"The law presumes that every vessel is seaworthy until the contrary is proved, and the burden of proving unseaworthiness lies with the insurance company." *Austin v. Servac Shipping Line*, 794 F.2d 941, 945 (5th Cir. 1986) (citing citation omitted); *see also Fed. Ins.*, 538 F. Supp. 2d at 694. There are, however, instances where the burden of proof is shifted to the assured. Thomas J. Schoenbaum, 2 *Admiralty and Maritime Law* § 19-16, at 500 (6th ed. 2018). At least two of those instances apply here.

### 1. The barge sank at its dock.

The LONE STAR sank at its dock. Fitzgerald Tr. at 113:22 - 115:12. A vessel that sinks at its dock is presumed to be unseaworthy, in the absence of a cause of the sinking. *See*, *e.g.*, *The BUFFALO*, 56 F.2d 738, 739 (2d Cir. 1932); *The JAY ST. TERMINAL NO. 3*, 281 F. 279, 280 (2d Cir. 1922); *The KATHRYN B. GUINAN*, 176 F. 301, 302 (2d Cir. 1910); *The JAMAICA*, 51 F.2d 858, 860 (W.D.N.Y. 1931); *Braker v. F.W. Jarvis Co.*, 166 F. 987, 988 (S.D.N.Y. 1908); *Forbes v. Merchants' Exp. & Transp. Co.*, 111 F. 796 (E.D.N.Y. 1901).

The burden is shifted to the insured where a vessel is presumed to be unseaworthy. *Cf.*

Schoenbaum, *supra*, at 500. "[T]he insured must produce convincing evidence of seaworthiness." *Id.* (citations omitted).

### 2. The cause of the sinking is unexplained.

The cause of the sinking of the LONE STAR is unexplained. MER will claim that it was caused by vandals or saboteurs, but it admits that this is based on assumptions and guesses. It has no expert witnesses who can substantiate such speculation. No unauthorized persons were observed on or near the barge at or about the time of the sinking. MER Tr. at 277-78. And nothing unusual was noted or reported by Anointed's guards from the time the LONE STAR was last seen afloat until the time it was found to have sunk. Anointed Tr. at 35-36, 78-79, 114-15 & 122-23.

MER does not claim that weather was a factor in the sinking. Nor can it. The weather on April 29 and 30, 2017 was not extraordinary. Research conducted by Starr's expert meteorologist shows that (1) winds speeds over the sheltered waters off Pier 3 were likely at mostly 10 knots or less with a maximum of about 14 knots and occasional highest gusts between 15 and 21 knots and (2) significant wave heights within the harbor near Pier 3 were between 1 and 2 feet, with choppiness likely present as downdrafts from passing showers and thunderstorms affected the area. Ex. 8 at 18.

"[T]he burden is shifted to the insured in the case of a mystery sinking or an unexplained loss." Schoenbaum, *supra*, at 500; *see also Ins. Co. of N. Am. v. Lanasa Shrimp Co.*, 726 F.2d 688, 690 (11th Cir. 1984) (collecting cases).

The LONE STAR was presumably unseaworthy. It is up to MER to rebut the presumption.

### B. MER Did Not Exercise Due Diligence

Even if the LONE STAR were not presumed to be unseaworthy, the following undisputed facts, individually or collectively, show that MER failed to use due diligence to maintain the barge

in a seaworthy condition:

- MER disregarded its own procedure to maintain the watertight integrity, trim, and stability of the hull when it cut the hull down beyond the "canoe" point at the bow and, as a result, there was only 2½ to 3 feet of vessel structure extending vertically above the waterline in this area. Magaraci Dec. ¶ 7; Ex.4 at 23.

- The barge was "replete" with "open and disconnected piping" that was "left totally open inside the hull, not blanked off or isolated by a valve." Ex. 4 at 14 & 23. "Any of the open and disconnected piping, if supplied with seawater, would allow flooding of the vessel's internal areas and, if unchecked, would eventually build up in volume until the vessel's reserve buoyancy was exceeded and the vessel sank." *Id.* at 23.

- Overboard openings on the hull were close to or below the vessel's waterline, which "would be potential and likely sources of seawater ingress in the event the vessel's draft increased, whether due to shifting of the vessel either by wave action or wind, or by gradual internal leakage, rainwater, or inflow from the sea chests." *Id.* at 14 (footnote omitted).

- The barge "was not in a towable condition." *Id.* at 23.

- MER did not block the sea chest openings to prevent seawater ingress to the vessel, contrary to good marine engineering practice. Fitzgerald Tr. at 170-72; Ex. 4 at 22.

- MER did not secure the sea chest valves in a closed position. Fitzgerald Tr. at 169; Ex. 4 at 22.

- MER did not pump water out of the barge for "four to five weeks" before it sank, even though there was some 5.26 to 5.4 inches of precipitation during that period. *See* Parmenter Tr. at 81-82; Fitzgerald Tr. at 108-09; Ex. 8 at 3 (Chart 2) & 8 (Chart 4).

- MER's employees did not go onto the barge to look for water accumulation, contrary to the practice set by Mr. Fitzgerald. Fitzgerald Tr. at 110; Parmenter Tr. at 47 & 81; Lopez Tr. at 52.

"[A] particular set of facts supporting an inference of unseaworthiness may also support an inference of negligence." *U.S. v. Banda Boats, Inc.*, 990 F.2d 626 (5th Cir. 1993) (citation omitted) (finding barge owner was negligent where it never inspected the barge's internals). Starr submits that the above set of facts supports an inference of negligence. Notably, MER has no expert

witness evidence to oppose the opinions of Starr's expert marine engineer and surveyor.

### C. The Court May Presume That Unseaworthiness Was The Proximate Cause Of The Sinking

Starr is not, as discussed above, required to show that the unseaworthiness of the LONE STAR was a proximate cause of the sinking. The breach of the express of warranty is enough, in and of itself, for Starr to avoid liability for the loss. *See Commercial Union*, 190 F.3d at 31-32.

It is worth noting that, where a vessel is presumed or shown to be unseaworthy, the Court may presume that the unseaworthiness was the proximate cause of an otherwise unexplained sinking in normal conditions. *See In re Marine Sulphur Queen*, 460 F.2d 89, 99 (2d Cir. 1972) ("It is settled that when a vessel disappears in expectable weather under otherwise unknown circumstances, proof … of some element of unseaworthiness will permit the trier of fact to infer that the unseaworthiness was the proximate cause of the loss"); *Federazione Italiana Dei Consorzi Agrari v. Mandask Compania De Vapores, S.A.*, 388 F.2d 434 (2d Cir. 1968) (presuming that loss was occasioned by the unseaworthiness of the vessel). Here, the LONE STAR sank for unknown reasons in normal conditions. It should be presumed that the unseaworthiness of the barge was the proximate cause of the sinking.

### POINT II

### STARR IS ENTITLED TO SUMMARY JUDGMENT ON ITS SECOND CAUSE OF ACTION

Starr alleges in its Second Cause of Action that the Policy is void *ab initio* because of misrepresentations made at the time MER applied to Starr for insurance. *See* Complaint ¶¶ 30-32. "It is well established that the parties to a marine insurance contract are held to the highest degree of good faith. Under this obligation, called *uberrimae fidei*, the party seeking insurance is required to disclose all circumstances known to him which materially affect the risk." *Puritan Ins. Co. v.*

*Eagle S.S. Co.*, 779 F.2d 866, 870 (2d Cir. 1985) (citation omitted). "If the insured makes a material misrepresentation or omission, intentionally or otherwise, and the insurer relies on this misrepresentation, the policy may be voided *ab initio*." *RLI Ins. Co. v. JDJ Marine, Inc.*, No. 07 Civ. 9546, 2012 WL 3765026, at *4 (S.D.N.Y. Aug. 29, 2012) (citations omitted); *see also Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 13 (2d Cir. 1986). " The standard for disclosure is an objective one, that is, whether a reasonable person in the assured's position would know that the particular fact is material." *Knight*, 804 F.2d at 13 (citation omitted). "A non-disclosed fact is material if it would have affected the insurer's decision to insure at all or at a particular premium." *NY Marine & General Ins. Co. v. Tradeline (L.L.C.)*, 266 F.3d 112, 123 (2d Cir. 2001) (citation omitted).

"Numerous courts have held that materiality is established as a matter of law where an insured egregiously misrepresents the value or condition of the object insured." *Fireman's Fund Ins. Co. v. Great Am. Ins. Co.*, 10 F. Supp. 3d 460, 490 (S.D.N.Y. 2014), *aff'd*, 822 F.3d 620 (2d Cir. 2016) (citing *Knight*, 804 F.2d at 13; *King v. Aetna Ins. Co.*, 54 F.2d 253, 254-55 (2d Cir. 1931); *Certain Underwriters at Lloyd's v. Montford*, 52 F.3d 219, 222 (9th Cir. 1995); *Albany Insurance Co. v. Horak*, No. 92 Civ. 2157, 1993 WL 269620, at *8 (E.D.N.Y. July 13, 1993)).

MER's Insurance Submission describes its "process of ship demolition" as "reverse-engineering the ship, through the removal of larger intact sections … while maintaining the ship's watertight integrity, trim and stability." Ex. A to Purdy Dec. at 1. The submission also stated that the vessels to be scrapped would be "reduced to the lower hull area" but "still afloat and capable of being towed." *Id.* None of this proved to be true with regard to MER's demolition of the LONE STAR. Starr's expert marine engineer and surveyor opines, among other things, that the LONE STAR's "watertight integrity and stability had been compromised" and that the barge "was not in a towable condition" prior to its sinking. Ex. 4 at 23. MER has no opposing expert evidence.

It cannot reasonably be disputed that the description of a vessel's watertight integrity, as well as its ability to be towed, all go to the vessel's condition. The Insurance Submission egregiously misrepresented the condition of the LONE STAR in these regards. Therefore, materiality should be considered established as a matter of law.

## POINT III

### STARR IS ENTITLED TO SUMMARY JUDGMENT
### ON ITS SIXTH CAUSE OF ACTION

MER admits that Starr issued a reservation of rights in connection with Starr's response to the sinking of the LONE STAR. Complaint ¶ 16; Answer ¶ 16. Starr alleges in its Sixth Cause of Action that it is entitled to recover from MER all costs and expenses that were incurred or paid by Starr related to the sinking of the LONE STAR because there is no coverage under the Policy. *See* Complaint ¶¶ 47-48. Starr is entitled to summary judgment on this claim should it be granted summary judgment on either its First or Second Causes of Action. *See*, *e.g.*, *Arch Ins. Co. v. Harleysville Worcester Ins. Co.*, 56 F. Supp. 3d 576, 581 (S.D.N.Y. 2014) ("insurer may seek reimbursement from an insured on the ground that the policy does not cover the loss").

## POINT IV

### STARR IS ENTITLED TO SUMMARY JUDGMENT
### ON COUNT II OF MER'S COUNTERCLAIMS

Count II of MER's Counterclaims alleges a claim for breach of contract. *See* Answer ¶¶ 114-17. It asserts that Starr breached the Policy five ways: (1) "by making false allegations that MER breached its duty of seaworthiness;" (2) "by seeking a declaration that the contract of insurance was breached or otherwise was void;" (3) "by wrongfully withholding coverage;" (4) "by wrongfully instructing MER that it must act as though it is uninsured;" and (5) "by wrongfully placing MER in a position that it risked civil and criminal penalties when it was, in fact, fully

insured." *Id.* ¶¶ 115-16.  These allegations are misplaced, either factually or legally.

MER's claim fails with regard to allegations (1), (3) and (5) because Starr is entitled to summary judgment for the reasons stated herein, and the effect of such judgment would be that there is no coverage under the Policy.  This is not the only reason MER's claim fails, and Starr otherwise reserves its defenses.

There was nothing improper about Starr seeking a declaration that the Policy was breached or is otherwise void.  Indeed, that is the whole point of a declaratory judgment action.  *See*, *e.g.*, *Lang v. Hanover Ins. Co.*, 820 N.E.2d 855, 857 (N.Y. 2004) ("There is no dispute that parties to an insurance contract … may bring a declaratory judgment action against each other when an actual controversy develops concerning the extent of coverage … or other issues arising from the insurance contract.").  "[I]t is not bad faith for an insurer to fight liability when policy coverage is unclear." *Am. Nat. Fire Ins. Co. v. Kenealy*, 72 F.3d 264, 270 (2d Cir. 1995) (citation omitted).

Starr advised MER to act as a "prudent uninsured" when Starr declined to consent to MER entering into a contract with Resolve for the salvage of the LONE STAR.  Ex. 11.  The Policy states that it "does not provide coverage for any cost or expense incurred and paid by the Insured without the prior consent of the Company ...."  Ex. B. to Purdy Dec. at 19 of 29, ch. 7 cl. (d).  In light of this provision and the position taken by Starr, there was nothing improper about Starr advising MER to act as a "prudent uninsured."

### POINT V

### COUNTS V AND VI OF MER'S COUNTERCLAIMS SHOULD BE DISMISSED FOR FAILURE TO STATE A PLAUSIBLE CLAIM

"Rule 12(c) permits a party to move for judgment on the pleadings '[a]fter the pleadings are closed -- but early enough not to delay trial.' " *Kinra v. Chicago Bridge & Iron Co.*, No. 17 Civ. 4251 (LGS), 2018 WL 2371030, at *6 (S.D.N.Y. May 24, 2018) (quoting Fed. R. Civ. P.

12(c)).  "Motions brought under Rule 12(c) are evaluated using the same standard as a motion to dismiss under Rule 12(b)(6)."  *Id.* (citation omitted).  To survive a motion to dismiss, a pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. … Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.* (citations and quotation marks omitted).

## A.    Count V Of MER's Counterclaims

In Count V of its Counterclaims, MER alleges that Starr breached its duty of good faith and fair dealing.  Answer ¶¶ 126-29.  The factual predicate for this claim is the same as that for MER's breach of contract claim alleged in Count II of the Counterclaims.  *See id.* ¶¶ 114-17.

New York law does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled.  *See*, *e.g.*, *Harris v. Provident Life & Acc. Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002); *Spandex House, Inc. v. Travelers Prop Cas. Co. of Am., Inc.*, No. 14 Civ. 4251, 2015 WL 509678, at *2 (S.D.N.Y. Feb. 6, 2015); *ICD Holdings S.A. v. Frankel*, 976 F. Supp. 234, 243 (S.D.N.Y. 1997).  This standard applies to marine insurance contracts.  *See*, *e.g.*, *Rosano v. Freedom Boat Corp.*, No. 13 Civ. 842, 2015 WL 4162754, at *5 (E.D.N.Y. July 8, 2015).

MER cannot assert an independent claim for breach of the implied covenant of good faith and fair dealing.  Count V of the Counterclaims must be dismissed for failure to state a claim.

## B.    Count VI Of MER's Counterclaims

Count VI of the Counterclaims purports to allege a claim for bad faith.  The solitary allegation made in support of this claim states:

> Taken as a whole, Starr's actions evidence bad faith insurance practice that Starr knows has the potential to push MER -- a new and relatively small company with limited resources -- into bankruptcy.  MER should be entitled to damages, including punitive damages, in an amount to be determined at trial for such bad faith.

Answer ¶ 131.

As noted above, New York law does not recognize an independent cause of action against an insurer for bad faith. This standard applies to marine insurance contracts. *See*, *e.g.*, *Rosano*, 2015 WL 4162754 at *5. A claim for consequential damages beyond what may be owed under the contract of insurance (*e.g.*, attorneys' fees) is subsumed within a breach of contract claim. *See Bi-Econ. Mkt., Inc. v. Harleysville Ins. Co. of New York*, 886 N.E.2d 127, 130 (N.Y. 2008).[13] Count VI of the Counterclaim must be dismissed for failure to state a claim.

In any event, punitive damages are not available under New York law for a simple breach of contract. *Smith v. Lightning Bolt Prods.*, 861 F.2d 363, 371 (2d Cir. 1988) (collecting cases). Rather, punitive damages are limited to cases where the conduct is " 'gross, wanton, or willful fraud or other morally culpable conduct' to an extreme degree.' " *Id.* (quoting *Borkowski v. Borkowski*, 355 N.E.2d 287 (N.Y. 1976)). New York law also requires evidence of more than "an isolated transaction incident to an otherwise legitimate business" to support a claim for punitive damages. *Walker v. Sheldon*, 179 N.E.2d 497, 499 (N.Y. 1961); *see also Smith*, 861 F.2d at 371.

In the context of an insurance contract, punitive damages are not available unless the insured shows both "egregious tortious conduct" directed at the insured and "a pattern of similar conduct directed at the public generally." *New York Univ. v. Continental Ins. Co.*, 662 N.E.2d 763, 767 (N.Y. 1995); *see also Rocanova v. Equitable Life Assur. Socy. of U.S.*, 634 N.E.2d 940, 944 (N.Y. 1994). New York courts routinely dismiss claims for punitive damages in insurance cases where there has been no showing that the insurer "in its dealings with the general public, had

---

[13] However, "the general rule is that the award of fees and expenses in admiralty actions is discretionary with the district judge upon a finding of bad faith." *Ingersoll Mill. Mach. Co. v. M/V BODENA*, 829 F.2d 293, 309 (2d Cir. 1987). This federal admiralty rule "must be followed instead of state law" in a marine insurance coverage dispute such as this. *Am. Nat. Fire*, 72 F.3d at 270 (citations omitted).

engaged in a fraudulent scheme evincing such a high degree of moral turpitude and … such wanton dishonesty as to imply a criminal indifference to civil obligations." *Eccobay Sportswear, Inc. v. Providence Washington Ins. Co.*, 585 F. Supp. 1343, 1344 (S.D.N.Y.1984).

MER does not allege any "egregious tortious conduct" by Starr. Nor does it allege "a pattern of similar conduct directed at the public generally." Its minimal pleading, which does not indicate that Starr's conduct was "morally culpable, or … actuated by evil and reprehensible motives," *Walker*, 179 N.E.2d at 498, is insufficient to support a claim for punitive damages.

## CONCLUSION

Starr's motion should be granted. Starr is entitled to summary judgment on the First, Second and Sixth Causes of Action in the Complaint, as well as on Count II of MER's Counterclaims. Counts V and VI of MER's Counterclaims should be dismissed for failure to state a plausible claim.

Dated: New York, New York
April 3, 2019

Respectfully submitted,

NICOLETTI HORNIG & SWEENEY
*Attorneys for Plaintiff*

By:     S/ Kevin J.B. O'Malley
Guerric S.D.L. Russell
Terry L. Stoltz
Kevin J.B. O'Malley
Wall Street Plaza
88 Pine Street, Seventh Floor
New York, New York 10005
(212) 220-3830
grussell@nicolettihornig.com
tstoltz@nicolettihornig.com
komalley@nicolettihornig.com